IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON


JUDI W.,[1]                                                      Case No. 3:18-cv-01056-SB

                  Plaintiff,                                   **OPINION AND ORDER**

        v.

ANDREW M. SAUL, Commissioner of Social
Security,

                  Defendant.

_____

**BECKERMAN, U.S. Magistrate Judge.**

      Judi W. ("Plaintiff") brings this appeal challenging the Commissioner of the Social

Security Administration's ("Commissioner") denial of her application for Disability Insurance

Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401-34. The Court has

jurisdiction to hear Plaintiff's appeal pursuant to 42 U.S.C. § 405(g). For the reasons explained

below, the Court reverses the Commissioner's decision and remands for further administrative

proceedings.

_____

      [1] In the interest of privacy, this opinion uses only the first name and the initial of the last
name of the non-governmental party in this case. Where applicable, this opinion uses the same
designation for a non-governmental party's immediate family member.

# BACKGROUND

Plaintiff was born in December 1958, making her fifty years old on December 9, 2008, the amended alleged disability onset date. (Tr. 10, 18.) Plaintiff has a high school education and past work experience as a customer service supervisor. (Tr. 18, 136.) In her DIB application, Plaintiff alleges disability due to chronic obstructive pulmonary disease ("COPD"), kidney disease, arthritis, osteoporosis, migraines, hypothyroidism, and left lung tumors.[2] (Tr. 42, 49, 126.)

On April 24, 2007, over a year and a half before the amended alleged disability onset date, Plaintiff underwent a "standardized noncontrast renal colic" computed tomography ("CT") scan because kidney stones were revealed during Plaintiff's last examination on January 10, 2006, and because Plaintiff reported "a history of renal colic on the right side for the last 10 days." (Tr. 785-86.) Plaintiff's CT scan revealed, among other things: (1) "[n]o definite evidence of renal obstruction or dilation of either renal collecting system"; (2) "[n]o change in the bilateral intrarenal calculi"; and (3) "[p]ossible changes of medullary sponge kidney [disease]." (Tr. 785-86; *see also* Tr. 781, stating that the CT scan revealed "[s]cattered small calcifications within the

---

[2] To be eligible for DIB, "a worker must have earned a sufficient number of [quarters of coverage] within a rolling forty quarter period." *Herbert v. Astrue*, No. 07-cv-01016, 2008 WL 4490024, at *4 n.3 (E.D. Cal. Sept. 30, 2008). Quarters of coverage are accumulated based on a worker's earnings. *Id.* Typically, "the claimant must have a minimum of twenty quarters of coverage [during the rolling forty quarter period to maintain insured status] . . . . The termination of a claimant's insured status is frequently referred to as the 'date last insured' or 'DLI.'" *Id.* (citations omitted). Thus, Plaintiff's date last insured of December 31, 2008 (*see* Tr. 10), reflects the date on which her insured status terminated based on the prior accumulation of quarters of coverage. If Plaintiff established that she was disabled on or before December 31, 2008, she is entitled to DIB. *See Truelsen v. Comm'r Soc. Sec.*, No. 2:15–cv–02386, 2016 WL 4494471, at *1 n.4 (E.D. Cal. Aug. 26, 2016) ("To be entitled to DIB, plaintiff must establish that he was disabled . . . on or before his date last insured." (citing *Tidwell v. Apfel*, 161 F.3d 599, 601 (9th Cir. 1999))).

kidneys [that were] stable versus [the] slightly more conspicuous [calcifications] in the prior CT"

scan).

On April 27, 2007, Plaintiff primary care physician, David Hindahl, M.D.

("Dr. Hindahl"), noted that Plaintiff reported "feeling better though [her] side [was] still achy,"

and that Plaintiff "[h]ad a stone, almost certainly, but [she] seem[ed] to have passed it."

(Tr. 416.) The next day, Plaintiff complained of continued flank pain, nausea, and vomiting.

(Tr. 416.)

On May 29, 2007, Plaintiff visited Judy Perry-Rose, M.D. ("Dr. Perry-Rose") and

reported that she was "the primary caretaker during the day" for her seven-year old

granddaughter who suffers from cancer, she lives with her husband, three daughters, and three

grandchildren, and her anxiety medication (lorazepam) was producing "diminishing benefits."

(Tr. 415.)

On August 26, 2007, Plaintiff complained of abdominal pain and an x-ray revealed

"[l]ittle interval change," normal gas pattern, and no evidence of a suspected obstruction.

(Tr. 784.) The attending physician, John Ross, D.O. ("Dr. Ross"), noted that Plaintiff had a

"known history of kidney stones and a medullary sponge kidney," Plaintiff's "final diagnosis"

was nephrolithiasis, and Plaintiff was discharged with oxycodone and Phenergan prescriptions.[3]

(Tr. 412-13.)

On June 23, 2008, an x-ray of Plaintiff's abdomen revealed "several tiny calyceal calculi

within the left kidney, but [there was] nothing noted along the course of the left ureter."

---

[3] "Nephrolithiasis is a condition marked by the presence of renal calculi (an abnormal concretion occurring within the kidney and usually composed of mineral salts)." *Torres v. Sec'y of Health & Human Servs.*, 870 F.2d 742, 745 n.5 (1st Cir. 1989) (citation omitted); *see also Conrad v. Berryhill*, No. 16-cv-07987-JPR, 2018 WL 437460, at *9 n.10 (C.D. Cal. Jan. 16, 2018) (explaining that "[n]ephrolithiasis is the medical term for kidney stones") (citation omitted).

(Tr. 780.) Plaintiff's urologist, Richard Steinberg, M.D. ("Dr. Steinberg"), stated that he recommended that Plaintiff "consider doing [a] left ureteroscopy to clean out her kidneys," but Plaintiff had "an ill [grand]child that she need[ed] to take care of[.]" (Tr. 403.) Dr. Steinberg added that a left ureteroscopy would be scheduled once Plaintiff's "child[care] situation [was] under control," and that Plaintiff would continue taking oxycodone, Compazine, and Flomax. (Tr. 403.)

On July 29, 2008, a CT scan revealed "[b]ilateral nephrolithiasis . . . without evidence for hydroureteronephrosis similar to what was documented" on Plaintiff's prior CT scan. (Tr. 778-79.) One month later, Dr. Steinberg performed a "left ureterolithotomy with stent placement." (Tr. 776.)

On November 3, 2008, Plaintiff reported that she was "passing kidney stones again" and that she was suffering from severe lower back pain due to "her kidney stones and sciatica." (Tr. 394.) Dr. Steinberg prescribed Vicodin to address Plaintiff's kidney-related "discomfort." (Tr. 394.)

On November 25, 2008, about two weeks before the amended alleged disability onset date, Plaintiff reported that she was "not completely pain free," but she was doing "much better." (Tr. 393.) Dr. Hindahl noted that Plaintiff went "through 60 . . . Oxycodone[] already since" November 13, 2008, because she was "passing a lot of stones and having quite a bit of pain." (Tr. 393.) Dr. Hindahl added that Plaintiff was "to try to start cutting back on Oxycodone use," and that Plaintiff "will always need to have some [type of] medicine for breakthrough pain." (Tr. 393.)

In a treatment note dated December 9, 2008, Dr. Hindahl noted that Plaintiff reported that her pain control was "better" and that she "only used half of her breakthrough" medication. (Tr. 392.)

On February 4, 2009, Plaintiff reported that she "continue[d] to have nephrolithiasis with production of kidney stones that are painful," and that her kidney stone-related pain was "part of the reason she had been sleeping no more than about 2 hours a night for the recent 2 months." (Tr. 391.)

In a treatment note dated January 29, 2010, Dr. Hindahl noted that Plaintiff violated her opiate therapy plan:

> I need [Plaintiff] to explain why there was Methadone in her urine.
> It is not prescribed by us. This represents a major violation of her
> opiate therapy plan and puts future access to narcotics in jeopardy.
> It is extremely dangerous to combine methadone and long acting
> Morphine. This is a way that people accidentally kill themselves
> with these types of drugs. If I cannot trust that she is avoiding other
> medicines that she gets on the street or elsewhere, I cannot
> continue to prescribe such powerful narcotics for her.

(Tr. 378.) Plaintiff reported that "morphine was not working so a friend gave her methadone." (Tr. 378.)

On February 2, 2010, Dr. Hindahl noted that Plaintiff was "having terrible pain from her multiple kidney stones," Plaintiff took methadone because morphine was not working effectively and she could not go to the emergency room since "her disabled granddaughter was having seizures," Plaintiff was "mortified" when he told her that she could have died from mixing methadone and morphine, Plaintiff's pain is "real and unremitting," and Plaintiff has "been told several times by urology that they can't really help her due [to] . . . all the stones she makes." (Tr. 377.) Dr. Hindahl subsequently observed that he "actually trust[s] [Plaintiff] a great deal"

and believed her "story of being in a total, screaming panic about the [severity of her] pain."

(Tr. 376.)

On May 31, 2010, Plaintiff underwent a renal ultrasound based on complaints of bilateral flank pain and hematuria. (Tr. 763.) Plaintiff's ultrasound revealed: (1) "[n]o hydronephrosis"; (2) an unremarkable bladder; and (3) a "[s]mall bilateral . . . nonobstructing renal calculi." (Tr. 763.)

On June 3, 2010, Plaintiff's imaging was unremarkable and showed "[n]o sign of renal calculi." (Tr. 761.) Dr. Steinberg stated that it was unlikely Plaintiff had "any active stones." (Tr. 369.)

On May 2, 2011, Plaintiff visited Kelly Cushing, D.O. ("Dr. Cushing"), and reported that she fell "during a pain episode while passing a kidney stone." (Tr. 357.) Dr. Cushing noted that Plaintiff's recent urine drug screen was positive for certain unprescribed medications (oxymorphone and methadone) but was not positive for morphine even though Plaintiff is prescribed "150 mg daily." (Tr. 357.) Dr. Cushing noted that Plaintiff had "no answer" when asked "why morphine was not in her urine." (Tr. 357.) Dr. Cushing also addressed opioid dependence:

> [It is] [v]ery concerning that she is taking multiple opiates, but NOT taking [the] morphine that is prescribed. She is certainly at risk for complications from overdose. I declined injectable opiate narcotics today. Patient advised she may use oxycodone she should have at home from her [opioid treatment program]. No new opiate [prescriptions] from me. I suspect she has addiction issues, but [she is] not open to this discussion. [She] [a]grees to follow up with [her primary care provider] regarding opiate use. I ordered a [urine drug screen] today [but] . . . [s]he did not comply. No [urine drug screen] resulted.

(Tr. 358.)

On August 8, 2011, Plaintiff presented for a follow-up visit with Dr. Hindahl regarding her "opiate therapy plan and chronic pain management." (Tr. 354.) According to Dr. Hindahl, Plaintiff indicated that she "would like to have better pain control and perceive[d] a need for more Oxycodone." (Tr. 354.) Dr. Hindahl elected to increase Plaintiff's morphine dosage. (Tr. 354.)

In a treatment note dated September 19, 2011, Dr. Hindahl noted that Plaintiff had "been feeling well and feel[ing] like things are going better in general," and that Plaintiff "still passes [kidney] stones about twice a month and there is nothing much [that can] be done about that." (Tr. 351.)

In October 2011, Plaintiff was "found" around "5 a.m. at a Kaiser pharmacy," admitted to the hospital due to a "possible overdose," and administered, *inter alia*, "Narcan IV."[4] (Tr. 307, 312, 318.) Plaintiff's morphine dosage was subsequently reduced by fifty percent. (*See* Tr. 347, stating that Plaintiff's morphine was "decreased from 60 mg three times daily to 30 mg three times daily").

On July 18, 2012, images of Plaintiff's abdomen and pelvis revealed a "[p]ossible 2mm upper pole left renal stone" and "[n]o convincing evidence for urinary calculi elsewhere." (Tr. 690.) Later that year, Plaintiff's imaging revealed a "nonobstructing left renal calculus." (Tr. 680.)

On June 14, 2013, an x-ray of Plaintiff's kidneys revealed a "[s]table . . . presumed stone in the superior pole of the left kidney" and "[n]o other convincing urinary calculi elsewhere." (Tr. 657.)

---

[4] Narcan is "a drug designed to counter the effect of a drug overdose." *United States v. George*, 987 F.2d 1428, 1430 (9th Cir. 1993).

On July 17, 2014, Plaintiff's ultrasound revealed: (1) "[b]ilateral nonobstructing renal calculi"; (2) "[n]o hydronephrosis"; and (3) an "[u]nremarkable appearing bladder." (Tr. 633-34.)

On May 28, 2015, Richard Winslow, M.D. ("Dr. Winslow"), a non-examining state agency psychological consultant, completed a psychiatric review technique assessment. (Tr. 45-46.) Dr. Winslow reviewed Plaintiff's medical records and determined that Plaintiff's mental impairments failed to meet or equal listings 12.04 (affective disorders) and 12.06 (anxiety-related disorders).

On October 12, 2015, Bill Hennings, Ph.D. ("Dr. Hennings"), a non-examining state agency psychologist, completed a psychiatric review technique assessment. (Tr. 53.) Dr. Hennings concluded that Plaintiff's impairments failed to meet or equal listings 12.04 and 12.06.

On January 15, 2016, Dr. Hindahl filled out a questionnaire prepared by Plaintiff's counsel. (Tr. 814-19.) Dr. Hindahl stated, *inter alia*, that he first met Plaintiff in 2006; Plaintiff suffers from medullary sponge kidney and recurrent pain from kidney stones; Plaintiff's prognosis is poor; Plaintiff's symptoms are confirmed by abnormal kidney imaging studies; Plaintiff would need to work at a reduced pace even if she was limited to light or sedentary work; Plaintiff is not a malingerer and does not have any drug or alcohol abuse issues; Plaintiff's impairments or treatment would cause her to be absent from work more than four times a month; and 2012 is "the approximate date from which [Plaintiff] has continuously been unable to work." (Tr. 814-19.) Dr. Hindahl also noted that he is "not trained at rating functional capacity," and therefore declined to provide any opinions regarding environmental restrictions or Plaintiff's

ability to sit, stand, walk, lift, carry, stoop, crouch, climb, handle, reach, finger, push, and pull. (Tr. 814-19.)

On March 15, 2017, Plaintiff appeared and testified at a hearing before an Administrative Law Judge ("ALJ"). (Tr. 28-40.) Plaintiff testified that, as of December 9, 2008 (i.e., the amended alleged onset date), she could not work because she was suffering from kidney stones and needed to spend a lot of time in bed and the bathroom. Plaintiff explained that before she received stents, her kidney stones were "very painful" and her disease caused her to "keep making the stones." (Tr. 32.) Plaintiff also testified that she last worked in 2003, she served as the caretaker for her "granddaughter wh[en] [she] was pretty sick [due to] cancer" and her "daughter helped," her medications help control the pain caused by her continuous passing of stones, she lives with her husband and granddaughter, and her daughter lives in the same apartment complex.[5] (Tr. 33-35.)

In a written decision issued on June 15, 2017, the ALJ applied the five-step process set forth in 20 C.F.R. § 404.1520(a)(4), and found that Plaintiff was not disabled. *See infra*. The Social Security Administration Appeals Council denied Plaintiff's petition for review, making the ALJ's decision the Commissioner's final decision. Plaintiff timely appealed to federal district court.

## THE FIVE-STEP SEQUENTIAL ANALYSIS

## I. LEGAL STANDARD

A claimant is considered disabled if he or she is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which

---

[5] The ALJ did not pose any questions to a Vocational Expert ("VE") at Plaintiff's administrative hearing because the ALJ determined that a VE "was[] [not] necessary." (Tr. 39-40.)

. . . has lasted or can be expected to last for a continuous period of not less than 12 months[.]" 42 U.S.C. § 423(d)(1)(A). "Social Security Regulations set out a five-step sequential process for determining whether an applicant is disabled within the meaning of the Social Security Act." *Keyser v. Comm'r Soc. Sec. Admin.*, 648 F.3d 721, 724 (9th Cir. 2011). Those five steps are: (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the claimant can return to any past relevant work; and (5) whether the claimant is capable of performing other work that exists in significant numbers in the national economy. *Id.* at 724-25. The claimant bears the burden of proof for the first four steps. *Bustamante v. Massanari*, 262 F.3d 949, 953-54 (9th Cir. 2001). If the claimant fails to meet the burden at any of those steps, the claimant is not disabled. *Id.*; *Bowen v. Yuckert*, 482 U.S. 137, 140-41 (1987).

The Commissioner bears the burden of proof at step five of the process, where the Commissioner must show the claimant can perform other work that exists in significant numbers in the national economy, "taking into consideration the claimant's residual functional capacity, age, education, and work experience." *Tackett v. Apfel*, 180 F.3d 1094, 1100 (9th Cir. 1999). If the Commissioner fails to meet this burden, the claimant is disabled. *Bustamante*, 262 F.3d at 954 (citations omitted).

## II.  THE ALJ'S DECISION

The ALJ applied the five-step sequential process to determine if Plaintiff is disabled. (Tr. 10-19.) At step one, the ALJ determined that Plaintiff had not engaged in substantial gainful activity since December 9, 2008, the amended alleged disability onset date. (Tr. 12.) At step two, the ALJ determined that Plaintiff suffered from the following severe impairments: "[A]nxiety and a history of nephrolithiasis." (Tr. 12.) At step three, the ALJ concluded that Plaintiff did not

have an impairment that meets or equals a listed impairment. (Tr. 13.) The ALJ then concluded that Plaintiff had the residual functional capacity ("RFC") to perform "a full range of work at all exertional levels," subject to the following non-exertional limitation: Plaintiff needs to be "limited to simple, repetitive, routine tasks." (Tr. 15.) At step four, the ALJ determined that Plaintiff was "unable to perform any past relevant work." (Tr. 18.) At step five, the ALJ concluded that the Medical-Vocational Guidelines directed a finding of "not disabled." (Tr. 18-19.)

## ANALYSIS

I.      **STANDARD OF REVIEW**

The district court may set aside a denial of benefits only if the Commissioner's findings are "'not supported by substantial evidence or [are] based on legal error.'" *Bray v. Comm'r Soc. Sec. Admin.*, 554 F.3d 1219, 1222 (9th Cir. 2009) (quoting *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 882 (9th Cir. 2006)). Substantial evidence is defined as "'more than a mere scintilla [of evidence] but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* (quoting *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995)).

The district court "cannot affirm the Commissioner's decision 'simply by isolating a specific quantum of supporting evidence.'" *Holohan v. Massanari*, 246 F.3d 1195, 1201 (9th Cir. 2001) (quoting *Tackett*, 180 F.3d at 1097). Instead, the district court must consider the entire record, weighing the evidence that both supports and detracts from the Commissioner's conclusions. *Id.* If the evidence as a whole can support more than one rational interpretation, the ALJ's decision must be upheld; the district court may not substitute its judgment for the judgment of the ALJ. *Bray*, 554 F.3d at 1222 (citing *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007)).

## II.  DISCUSSION

In this appeal, Plaintiff argues that the ALJ erred by: (1) failing to provide clear and convincing reasons for discounting Plaintiff's symptom testimony; (2) failing to address Dr. Hindahl's opinion; (3) formulating an RFC that did not include any limitations caused by Plaintiff's kidney disease; (4) formulating an RFC that fails to capture Plaintiff's moderate limitation in maintaining concentration, persistence, and pace; and (5) failing to meet his burden of proof at step five. As explained below, the Court concludes that the ALJ's decision is based on harmful legal error and not supported by substantial evidence. Accordingly, the Court reverses the Commissioner's decision and remands for further proceedings consistent with this opinion.

### A.  Plaintiff's Symptom Testimony

#### 1.  Applicable Law

The Ninth Circuit has "established a two-step analysis for determining the extent to which a claimant's symptom testimony must be credited[.]" *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017). "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment 'which could reasonably be expected to produce the pain or other symptoms alleged.'" *Garrison v. Colvin*, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1282 (9th Cir. 1996)). Second, "[i]f the claimant meets the first test and there is no evidence of malingering, the ALJ can only reject the claimant's testimony about the severity of the symptoms if she gives specific, clear and convincing reasons for the rejection." *Ghanim v. Colvin*, 763 F.3d 1154, 1163 (9th Cir. 2014) (citation and quotation marks omitted).

Under Ninth Circuit case law, clear and convincing reasons for rejecting a claimant's subjective symptom testimony "include conflicting medical evidence, effective medical

treatment, medical noncompliance, inconsistencies in the claimant's testimony or between her

testimony and her conduct, daily activities inconsistent with the alleged symptoms, and

testimony from physicians and third parties about the nature, severity and effect of the symptoms

complained of." *Bowers v. Astrue*, No. 11-cv-583-SI, 2012 WL 2401642, at *9 (D. Or. June 25,

2012) (citing *Tommasetti v. Astrue*, 533 F.3d 1035, 1040 (9th Cir. 2008), *Lingenfelter v. Astrue*,

504 F.3d 1028, 1040 (9th Cir. 2007), and *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir.

1997)).

### 2.      Application of Law to Fact

In this case, there is no evidence of malingering and the ALJ determined that Plaintiff has

provided objective medical evidence of an underlying impairment which might reasonably

produce the symptoms alleged. (*See* Tr. 16, finding that Plaintiff's "medically determinable

impairments could reasonably be expected to cause the alleged symptoms"). The ALJ was

therefore required to provide clear and convincing reasons for discrediting Plaintiff's testimony.

*See Ghanim*, 763 F.3d at 1163. The Court concludes that the ALJ met the clear and convincing

reasons standard.

### a.      Plaintiff's Reported Activities

First, the ALJ discounted Plaintiff's symptom testimony based on her reported activities.

(*See* Tr. 16, noting that Plaintiff "reported a wide variety of activities" despite her allegations of

disabling kidney stone pain, and stating that Plaintiff's activities are inconsistent with the

severity of her pain allegations). In support of this finding, the ALJ noted that Plaintiff reported

that she helps "care for her grandkids during the day," shops in stores, and prepares meals.

(Tr. 16; *see also* Tr. 15-16, describing Plaintiff's "wide variety of activities," and noting that she

also reported that she watches television, can "pay bills, count change, handle a savings account,

and use a checkbook or money order," and often interacts with her sister, daughters, and grandchildren).

It is well settled that an ALJ may discount a claimant's testimony based on activities that are incompatible with the claimant's testimony regarding the severity of her symptoms. *See Ghanim*, 763 F.3d at 1165 ("Engaging in daily activities that are incompatible with the severity of symptoms alleged can support an adverse credibility determination."); *Burrell v. Colvin*, 775 F.3d 1133, 1137-38 (9th Cir. 2014) ("Inconsistencies between a claimant's testimony and the claimant's reported activities provide a valid reason for an adverse credibility determination."). Even where the claimant's "activities suggest some difficulty functioning, they may be grounds for discrediting the claimant's testimony to the extent that they contradict claims of a totally debilitating impairment." *Molina v. Astrue*, 674 F.3d 1104, 1113 (9th Cir. 2012) (citation omitted).

Plaintiff argues that the ALJ's reliance on her reported activities was misplaced because the ALJ "failed to . . . account [for] the[] sporadic nature" of her reported activities. (Pl.'s Opening Br. at 22.) Plaintiff adds that the ALJ "failed to note" that she only "sometimes" prepares meals and her husband handles the chores and helps with shopping. (Pl.'s Opening Br. at 22.) Plaintiff also states that the record fails to suggest that she could, *inter alia*, care for her granddaughter on "days she suffered debilitating pain [due to] kidney stones[.]" (Pl.'s Opening Br. at 22.)

The Court is not persuaded by Plaintiff's arguments. The Court's review of the record reveals that the ALJ's decision to discount Plaintiff's testimony based on her reported activities is reasonable and supported by substantial evidence. (*Compare* Tr. 33, noting that Plaintiff testified that she was the caretaker for her granddaughter and that her daughter "helped as well,"

*with* Tr. 150-52, indicating that Plaintiff reported that she can prepare meals, she "sometimes" prepares "frozen food or soup," she typically cooks "about twice a month," she makes a list and shops in the store with her husband, her husband retrieves the items on her shopping list, she can pay bills, count change, handle a savings account, and use a checkbook or money order, and she often visits with her sister, daughters, and grandchildren, *and* Tr. 244, noting that Plaintiff reported that she had adopted her granddaughter, *and* Tr. 274, noting that Plaintiff is "responsible for caring for her [granddaughter] full-time," *and* Tr. 280, indicating that Plaintiff has "a 12-year-old granddaughter with [cancer] . . . who lives with them most of the time" and that Plaintiff is "responsible for caring for her full-time," *and* Tr. 291, noting that Plaintiff "has tremendous stress over caring for a granddaughter . . . and [she] also tries to care for a disabled brother").

In sum, it was reasonable for the ALJ to conclude that Plaintiff's activities undermine her reports of completely debilitating pain. Accordingly, the ALJ did not err in discounting Plaintiff's testimony on this ground. *See Crawford v. Berryhill*, 745 F. App'x 751, 753 (9th Cir. 2018) (rejecting objections to the ALJ's findings because they "amount[ed] to advocating for alternatives to the ALJ's rational interpretation of the record and therefore d[id] not demonstrate error"); *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005) ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld."); *Wilcox ex rel. Wilcox v. Colvin*, No. 13-2201-SI, 2014 WL 6650181, at *5 (D. Or. Nov. 24, 2014) ("Plaintiff's alternative interpretation of the evidence is insufficient to overturn the ALJ's findings.").

### b.    Effective Mental Health Medication

The ALJ also discounted Plaintiff's testimony regarding the severity of her mental health symptoms, noting that: (1) the record "contain[s] only intermittent complaints of mental

symptoms"; (2) the record contains "few objective findings indicative of significant functional restrictions"; (3) Plaintiff had several unremarkable mental status examinations; (4) Plaintiff's anxiety complaints were "due largely to situational stressors"; and (5) Plaintiff reported that her "prescription medication was effective in helping her control her mental [health] symptoms." (Tr. 16; *see also* Tr. 15, noting that Plaintiff alleges that anxiety impairs her memory and ability to concentrate on tasks; "[h]owever, she [also] testified that her medication helped . . . control her symptoms").

"Evidence of effective treatment may support an ALJ's rejection of symptom allegations." *Cindy F. v. Berryhill*, 367 F. Supp. 3d 1195, 1210 (D. Or. 2019) (citation omitted). Indeed, the Ninth Circuit has stated that "[i]mpairments that can be controlled effectively with medication are not disabling for the purpose of determining eligibility for [Social Security] benefits." *Warre v. Comm'r of Soc. Sec. Admin.*, 439 F.3d 1001, 1006 (9th Cir. 2006) (citations omitted).

In this case, Plaintiff does not argue that the ALJ erred in concluding that her mental health symptoms are effectively controlled by medication. (*See* Pl.'s Opening Br. at 22-25, Pl.'s Reply 4-8, arguing only that the ALJ erred to the extent that he discounted Plaintiff's testimony based on the fact that her kidney stone pain was effectively treated and controlled by narcotic pain medication). Rather, Plaintiff argues that the "ALJ did not specifically find any particular allegation of mental impairment to be not credible" and that "it is not clear that the ALJ actually rejected any of Plaintiff's specific allegations of memory and concentration problems." (Pl.'s Reply Br. at 7.)

It is well settled that a district court "may draw reasonable inferences from the ALJ's decision 'if those inferences are there to be drawn.'" *Wilcox*, 2014 WL 6650181, at *7 (quoting

*Magallanes v. Bowen*, 881 F.2d 747, 755 (9th Cir. 1989)). Here, it is reasonable to infer from the ALJ's decision that he discounted Plaintiff's testimony that she suffers from debilitating anxiety because she reported that her anxiety can be controlled effectively with medication. (*See* Tr. 15, "The claimant also alleges . . . she had problems remembering and concentrating on tasks due to her anxiety. However, she testified that her medication helped . . . control her symptoms."; Tr. 16, discounting Plaintiff's testimony regarding the severity of her mental impairment and noting that Plaintiff's "prescription medication was effective in helping her control her mental [health] symptoms").

Accordingly, the Court concludes that the ALJ did not err in discounting Plaintiff's testimony on the ground that her anxiety can be effectively controlled with medication, because the ALJ's interpretation of the record is reasonable and supported by substantial evidence. (*See, e.g.*, Tr. 387, indicating that Plaintiff's treating psychiatrist, Dr. Perry-Rose, noted that Plaintiff reported that "lorazepam [was the] the most effective medication to date for her anxiety and panic, and she feels she is able to manage her life stressors quite well during the day"; Tr. 385, stating that Plaintiff was "very pleased with the medication program and the beginning benefit"; Tr. 391-92, indicating that Plaintiff reported that she was "managing life stresses well" and "not feeling any need for therapy"; Tr. 404, noting that Plaintiff reporting only having "perhaps 2 episodes of panic during th[e] entire year" and that "her anxiety is well managed by her own coping strategies and [treatment with] lorazepam"; Tr. 414, stating that Plaintiff was "achieving [an] excellent response" to lorazepam; Tr. 415, indicating that Plaintiff "report[ed] that [her] anxiety is controlled with lorazepam"; Tr. 421, noting that Plaintiff's anxiety is "largely controlled by medication").

///

### c.      Effective Pain Medication

The ALJ also discounted Plaintiff's testimony on the ground that her pain can be effectively controlled with medication. (*See* Tr. 15, noting that Plaintiff testified that she suffers from "very painful" kidney stones, but Plaintiff also testified that her "medication helped relieve her pain"; Tr. 16, discounting Plaintiff's testimony and stating that "her pain symptoms significantly improved with medication"; Tr. 17, indicating that the ALJ discounted Plaintiff's husband's testimony on the ground that Plaintiff's pain symptoms are "generally controlled with medication").

The Court concludes that the ALJ erred in discounting Plaintiff's testimony on the ground that her kidney stone pain can be controlled effectively with medication, because the ALJ's interpretation of the record was not reasonable or supported by substantial evidence. (*See* Tr. 198, noting that Dr. Hindahl stated that Plaintiff "will have ongoing lifelong problems with her kidneys"; Tr. 290, indicating that Dr. Hindahl referred to Plaintiff's nephrolithiasis as "a terrible and chronic problem for her" and stated that "there is not much to be done"; Tr. 296, observing that Plaintiff's nephrolithiasis is "chronic and unfixable"; Tr. 352, noting that Plaintiff's chronic pain improved on an increased dose of morphine and that Dr. Hindahl added that "[o]f course there is not much to do for [Plaintiff] when she passes stones"; Tr. 363, indicating that Plaintiff was "miserable" and suffered an "exacerbation of her chronic pain due to her medullary sponge kidney"; Tr. 369, stating that Plaintiff suffers from "recurrent" kidney stones; Tr. 374, noting that Plaintiff had "some breakthrough pain about 6 hours after the AM dose" of morphine; Tr. 377, indicating that Plaintiff's pain is "[r]eal and unremitting" and that the urology department "can't really help her due . . . [to] all the stones she makes"; Tr. 379, stating that Plaintiff's pain had "really been out of control the last day or two" despite taking large amounts of narcotic pain medication, Plaintiff reported that her pain was an eleven on a

ten-point scale, and Dr. Hindahl discussed "tolerance and the fact that [Plaintiff will] need to increase [her] dose at some point" to manage the pain; Tr. 381, noting that Plaintiff was passing "an increasing number of stones," Plaintiff's urologist stated that "she was just going to always have kidney stones and there was nothing to do but treat the pain," and Plaintiff's average pain was a seven).

### d.    Conservative Treatment

The ALJ also discounted Plaintiff's testimony on the ground that "her pain symptoms were treated conservatively with pain medication." (Tr. 16.) In so doing, the ALJ erred.

First, multiple narcotic pain medications, to include oxycodone and morphine, prescribed over the course of several years, is not "conservative" treatment. *See Bucknell v. Berryhill*, No. 18-0261, 2018 WL 6198459, at *4 (C.D. Cal. Nov. 27, 2018) (holding that "[t]he consistent use of . . . a strong opioid medication . . . cannot accurately be described as 'conservative' treatment") (citation and quotation marks omitted). Furthermore, the ALJ failed to specify what more aggressive treatment options were appropriate or available to treat Plaintiff's kidney stones, and the record suggests that no such treatment options existed. (*See* Tr. 296, observing that Plaintiff's nephrolithiasis is "chronic and unfixable"; Tr. 377, indicating that Plaintiff's pain is "[r]eal and unremitting" and that the urology department "can't really help her due . . . [to] all the stones she makes"; Tr. 381, noting that Plaintiff's urologist stated that "she was just going to always have kidney stones and there was nothing to do but treat the pain"); *see also Cindy F.*, 367 F. Supp. 3d at 1210 ("Because the ALJ did not specify what 'more aggressive treatment options [were] appropriate or available,' it would be illogical to discredit Plaintiff 'for failing to pursue non-conservative treatment options where none exist.'") (citation omitted). Accordingly, the ALJ erred to the extent that he discounted Plaintiff's symptom testimony on the ground that her pain symptoms were treated conservatively with narcotic pain medications.

###### e. Conclusion

Despite the errors identified above, the Court must uphold the ALJ's decision to discount Plaintiff's testimony because the ALJ provided at least two clear and convincing reasons for doing so. *See Anderson v. Colvin*, 223 F. Supp. 3d 1108, 1129 (D. Or. 2016) ("[T]he ALJ provided two clear and convincing reasons for finding Plaintiff's symptom testimony not supported by the record. Accordingly, the Court must uphold the ALJ's determination."); *Mones v. Comm'r Soc. Sec. Admin.*, No. 14-917-CL, 2015 WL 4645448, at *7 (D. Or. July 1, 2015) (finding that the ALJ erred in discounting the claimant's symptom testimony based on her activities and conflicting medical evidence but holding that any error was harmless because the ALJ did "provide[ ] two clear and convincing reasons").

### B. Medical Opinion Evidence

Plaintiff argues that the ALJ erred by failing to "even mention" Dr. Hindahl's opinion and by failing to account for the limitations Dr. Hindahl identified in formulating the RFC. (Pl.'s Opening Br. at 15.) Defendant acknowledges that the ALJ did not address Dr. Hindahl's opinion, but argues that the ALJ "had no obligation . . . to discuss Dr. Hindahl's opinion" because it "did not assess limitations during the relevant period" (i.e., December 9 to December 31, 2008). (Def.'s Br. at 14.) The Court disagrees.

In *McMath v. Berryhill*, No. 17-00344, 2018 WL 1045326, at *2 (W.D. Wash. Feb. 26, 2018), the claimant argued that the ALJ erred by failing to address an examining psychologist's opinion and a treating physician's opinion. *Id.* The district court held that the ALJ did not err in failing to address the examining psychologist's opinion because the opinion did not address the claimant's limitations during the period adjudicated by the ALJ. *Id.* The district court reached the same conclusion with respect to the claimant's treating physician's 2015 opinion. *See id.* at *3 ("Neither the form opinion nor the letter addresses [the claimant's] symptoms or limitations

during the period adjudicated by the ALJ, and therefore neither is relevant to the ALJ's determination of whether [she] was disabled during that time period. Accordingly, the ALJ did not err in failing to discuss [the treating physician's] 2015 opinion or in discounting the 2016 letter.").

Unlike *McMath*, it is not clear here that Dr. Hindahl's opinion fails to address Plaintiff's limitations during the period adjudicated by the ALJ. Dr. Hindahl was specifically asked to provide an opinion regarding Plaintiff's condition "on or before" December 31, 2008, which suggests that Dr. Hindahl's opinion addresses Plaintiff's pre-DLI condition. (Tr. 809.) Further, Dr. Hindahl's opinion indicates that he started treating Plaintiff in July 2006 and he based his opinion on "abnormal kidney imaging studies," which predate Plaintiff's amended alleged disability onset date. (*See* Tr. 814, "I first met her in July of 2006"; Tr. 426-27, stating that Plaintiff established care with Dr. Hindahl on July 14, 2006; *see also* Tr. 416, noting that Dr. Hindahl called Plaintiff on April 27, 2007, to report that her CT scan revealed "[s]tones in both kidneys"). Additionally, Dr. Hindahl's opinion concerns an impairment that is severe and considered a "recurrent," "lifelong," "unfixable" condition. (*See* Tr. 12, finding Plaintiff's history of nephrolithiasis to be a severe impairment "[t]hrough the date last insured"; Tr. 198, noting that Dr. Hindahl stated that Plaintiff "will have ongoing lifelong problems with her kidneys"; Tr. 296, indicating that Dr. Hindahl referred to Plaintiff's nephrolithiasis as "chronic and unfixable"; Tr. 814, opining that Plaintiff's symptoms include "recurrent pain from kidney stones"). Based on the foregoing, Dr. Hindahl's opinion is significant and probative of Plaintiff's condition during the period of interest.[6]

---

[6] Defendant also points to Dr. Hindahl's opinion that Plaintiff has "continuously" been unable to "work" since 2012, which is three years after Plaintiff's DLI. (*See* Tr. 818, "Please state the approximate date from which claimant has continuously been unable to work: 2012").

In light of the foregoing, the Court concludes that Dr. Hindahl's opinion is significant and probative and, therefore, the ALJ committed harmful error by failing to address it. *See Youngs v. Berryhill*, No. 6:16-cv-01601-AC, 2018 WL 385040, at *5 (D. Or. Jan. 11, 2018) ("Dr. Kaye treated plaintiff for a number of years, both before, and after plaintiff's date last insured. . . . [After the date last insured, Dr. Kaye wrote] that he considered plaintiff 'permanently disabled . . . .' Given that Dr. Kaye's [opinion] was written during his continued treatment of plaintiff, and it described his overall findings concerning the severity of plaintiff's mental impairments, it was 'significant, probative' evidence that the ALJ was required to consider. The ALJ erred by failing to discuss Dr. Kaye's . . . medical opinion.") (internal citations and ellipses omitted); *Myers v. Astrue*, No. 10-5864, 2011 WL 4352196, at *3-4 (W.D. Wash. Aug. 23, 2011) ("Dr. Cromwell's conclusion that these limitations were permanent limitations demonstrates that his opinion makes it more likely that plaintiff suffered these limitations during the period of disability. . . Therefore, Dr. Cromwell's opinion is relevant to the . . . period of interest and it was incumbent on the ALJ to provide specific reasons for rejecting this evidence, which she did not do. According to the Ninth Circuit, when an ALJ fails to discuss or completely ignores a treating physician's medical opinion, the case should be remanded to the agency for proper consideration of the evidence.") (citation omitted); *see also Tommasetti*, 533 F.3d at 1041 (stating that "[t]he ALJ must consider all medical opinion evidence").

C.     **The ALJ's RFC Determination**

Plaintiff argues that the ALJ's RFC determination is flawed because it does not include any limitations caused by Plaintiff's kidney disease. (Pl.'s Opening Br. at 9.) In response,

---

In the Court's view, the question presented is ambiguous because it does not define "continuously" or "work," and Dr. Hindahl's answer is therefore not probative, especially where his answer appears to be internally inconsistent with the rest of his letter opinion.

Defendant argues that the ALJ's RFC was not flawed because Plaintiff's treatment records "showed that medication effectively controlled her pain symptoms from her kidney condition." (Def.'s Br. at 7.) Defendant adds that, although Social Security regulations state that claimants who have no exertional limitations "ordinarily will not have a severe impairment," and although the ALJ found that Plaintiff has a severe kidney impairment but included no exertional limitations in the RFC, Plaintiff's "circumstances were not the ordinary case, and the record supported the ALJ's finding that her symptoms were well controlled with medication." (Def.'s Br. at 8.)

As discussed in Part II.A.2.c., substantial evidence does not support the ALJ's finding that Plaintiff's kidney pain was effectively controlled with medication. Accordingly, the Court rejects Defendant's argument that the ALJ formulated an appropriate RFC.

The Court also rejects Defendant's suggestion that the ALJ's error was harmless because the ALJ formulated an RFC that was "overinclus[ive]." (Def.'s Br. at 8) (citation omitted). The Court cannot so conclude where, as here, the ALJ found evidence of a severe kidney impairment, but failed to include any exertional limitations in the RFC despite evidence that medication failed effectively to control Plaintiff's pain symptoms. Accordingly, the Court concludes that the ALJ's error was harmful.[7]

### D.    Remedy

"Generally when a court of appeals reverses an administrative determination, 'the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation.'" *Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) (citation omitted).

---

[7] The Court does not address Plaintiff's remaining assignments of error because, as discussed below, this case must be remanded to allow the ALJ to reformulate the RFC after considering relevant medical opinion evidence.

However, in a number of Social Security cases, the Ninth Circuit has "stated or implied that it would be an abuse of discretion for a district court not to remand for an award of benefits" when three conditions are met. *Garrison*, 759 F.3d at 1020 (citations omitted). Specifically, the following "credit-as-true" criteria must be met before a district court may remand for an award of benefits: (1) "the ALJ has failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion," (2) "if the improperly discredited evidence were credited as true, the ALJ would be required to find the claimant disabled on remand," and (3) "the record has been fully developed and further administrative proceedings would serve no useful purpose." *Id*. Even when these "credit-as-true" criteria are satisfied, district courts retain the "flexibility to remand for further proceedings when the record as a whole creates serious doubt as to whether the claimant is, in fact, disabled within the meaning of the Social Security Act." *Id*.

In this case, the record has not been fully developed and further proceedings would serve a useful purpose. Plaintiff asks the Court to credit Dr. Hindahl's opinion as true. The ALJ, however, never addressed Dr. Hindahl's opinion and there could be legally sufficient reasons for rejecting it. On remand, the ALJ must address Dr. Hindahl's opinion and reformulate the RFC.

Plaintiff also asks the Court to credit her self-reports as true, but, as discussed above, the ALJ provided at least two clear and convincing reasons for discounting Plaintiff's symptom testimony.

Finally, Plaintiff asks the Court to instruct the ALJ on remand to solicit testimony from a VE and present hypothetical questions to a VE that account for Plaintiff's credible limitations. The record suggests that Plaintiff's kidney pain might impact her ability to, among other things, maintain regular attendance at work. Accordingly, the ALJ should provide Plaintiff an

opportunity to present hypotheticals to a VE that address such limitations. (*See* Pl.'s Opening Br. at 33, stating that a more developed record might show that the "rate of absenteeism caused by [Plaintiff's] kidney stones would rule out competitive employment" and that the "record lacks important vocational evidence that would support a request for immediate payment of benefits"). This will ensure that the record is adequately developed in the event of a second appeal.

## CONCLUSION

For the reasons stated, the Court REVERSES the Commissioner's decision and REMANDS for further proceedings.

**IT IS SO ORDERED.**

DATED this 18th day of July, 2019.

STACIE F. BECKERMAN
United States Magistrate Judge